809 S.W.2d 788 (1991)
C.T.W., Appellant,
v.
B.C.G. and D.T.G., by Next Friend, S.G., Appellees.
No. 09-90-004 CV.
Court of Appeals of Texas, Beaumont.
May 9, 1991.
Rehearing Denied May 29, 1991.
*790 Richard L. Scheer, Strong, Pipkin, Nelson & Bissell, Beaumont, for appellant.
Kenneth W. Lewis, Bush, Lewis, & Ramsey, Beaumont, for appellees.
Before WALKER, C.J., and BROOKSHIRE and BURGESS, JJ.

OPINION
BROOKSHIRE, Justice.
This is an action brought by Appellee, S.G., as next friend for the minor Appellees, B.G. and D.G., for actual damages and exemplary damages allegedly resulting from the negligence and gross negligence of Appellant in engaging in various sexual encounters with the two minor Appellees. After a jury trial, the trial court signed a judgment awarding each minor Appellee 1.3 million dollars in actual damages and 1 million dollars in exemplary damages. Appellant has perfected this appeal from the judgment of the trial court.
Appellant's first point of error asserts that there is no evidence or insufficient evidence of negligence on Appellant's part which proximately caused injury to Appellees. Appellant's second point of error urges that the trial court erred in defining the terms "negligence", "ordinary care", and "gross negligence" in terms of a person of ordinary prudence, because such definitions failed to take into account Appellant's mental illness. By his third point of error Appellant argues that there is no evidence of gross negligence on his part which proximately caused injury to Appellees, because Appellant could not have conscious indifference, or that alternatively, there was insufficient evidence of negligence on the part of Appellant which proximately caused injury to Appellees.
As to Appellant's first point of error, we must note that Appellees pleaded that Appellant was negligent in committing the following acts:
(1) showing to, and, or watching with the boys sexually explicit or pornographic films, videotapes, or photographs;
(2) photographing or filming the boys in the nude;
(3) showing photographs or films of nude people or sex organs to the boys;
(4) engaging in contact or stimulation of his penis or genitals in the presence of the boys;
(5) providing sexual devices to the boys;
(6) showing how to sexually arouse himself;
*791 (7) engaging in detailed discussions of sex acts with the boys;
(8) swimming or bathing in the nude with the boys;
(9) engaging in masturbation in the presence of the boys; and,
(10) engaging or attempting to engage in sexual acts or contact with the boys, including oral homosexual activity.
Appellees also pleaded that the total number of occurrences of such negligence was over one hundred times with each boy. They also alleged that such actions by Appellant were the result of uncontrollable urges brought about by an underlying psychosexual disorder. They pleaded that these incidents resulted in severe emotional distress and mental anguish to each of the boys.
Appellees also alleged that Appellant's failure to procure professional treatment for his known problem constituted negligence that was a proximate cause of injury and damage to the boys. They also alleged that these actions and inactions of Appellant constituted negligent infliction of emotional distress; and that the actions and inactions of Appellant constituted gross negligence, thus justifying the award of punitive damages.
B.G. and D.G. were Appellant's stepgrandsons. The incidents giving rise to this action began in 1981, when B.G. was approximately eight years old. These incidents with B.G. continued for approximately three or four years. As B.G. became older, Appellant lost interest in him as a sexual partner and began sexual encounters with D.G., the younger of the two brothers. D.G. was approximately six or seven years old when Appellant initiated sexual encounters with him. The encounters with D.G. continued for about a year or one and one-half years.
Each of the occurrences in question involved Appellant and only one of the boys. C.T.W. admitted committing virtually all the acts alleged in Appellees' trial pleadings. He showed "X-rated" movies and pornographic pictures and devices to B.G. He "skinny-dipped" with B.G. C.T.W. hooked a vacuum cleaner to his penis and encouraged B.G. to do the same. C.T.W. had a mannequin-like dummy used for first aid training in the fire department where he worked. He took the head off the dummy and attached it to his penis in B.G.'s presence. He took pictures of his penis and showed them to B.G.
C.T.W. had oral sex with D.G. On at least one occasion following this oral sex C.T.W. ejaculated into the bathroom sink. During "skinny-dipping" incidents with the boys, he had the boys play with artificial penises. He made videotapes or films of the boys while they were nude. He photographed the boys' penises and showed them the photographs. C.T.W. destroyed or erased these photographs and videotapes before the boys' parents discovered what Appellant had been doing. All of the sexual encounters with the boys occurred when they were visiting at the C.T.W. home where Appellant and his wife, the boys' paternal grandmother, lived. C.T.W. admitted that hundreds of these encounters occurred with the boys.
These incidents were discovered by the boys' parents when D.G. told his mother about the "games" he and his "pawpaw" had been playing.
Appellant argues that, even if the definitions provided to the jury concerning negligence were correct, there is no evidence that C.T.W. was negligent. This argument is based upon the fact that Mr. Velardo, the social worker who is treating the boys, testified that C.T.W. suffers from a mental disease called pedophilia. Velardo also testified that pedophiles do not know that their behavior is wrong. C.T.W. testified that his behavior was beyond his control. C.T.W.'s psychotherapist testified that his behavior was beyond his conscious control.
Appellees' expert witness, Dr. Gripon agreed that C.T.W. suffered from pedophilia, which he characterized as a psychosexual disorder rather than a mental illness. Dr. Gripon also stated that nobody chooses to become a pedophile nor can a pedophile be called an ordinary person.
*792 Appellant furthermore states that Appellees abandoned any theory of negligence other than the theory that it was negligent of Appellant to fail to seek professional treatment. However, the record reveals that Appellees also asserted throughout the trial that Appellant was negligent in not avoiding situations in which he would be alone with one of the boys when he knew he had strong sexual urges toward them.
In addressing "no evidence" points of error we must consider only the evidence and reasonable inferences that may be drawn from such evidence. Garza v. Alviar, 395 S.W.2d 821 (Tex.1965). We must also view such evidence in the light most favorable to the verdict of the jury. Garza, supra. In reviewing factual sufficiency points of error, we must consider all of the evidence and sustain such point only if the verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust. In re King's Estate, 150 Tex. 662, 244 S.W.2d 660 (1951).
Dr. Gripon also testified that pedophiles know that their sexual urges are not as they should be and that they will lead to trouble. He also testified that there is nothing that would prohibit pedophiles from refraining from such conduct, from getting help, or from seeing that they don't get around young boys. Dr. Gripon stated that he had seen people who had pedophilia but reacted to it reasonably and sought help. He also testified that the sexual urges of pedophiles are like any other sexual urge except that it is focused on young boys.
From such evidence, the jury could have found that an ordinary, prudent person, under similar circumstances, would have at least avoided situations in which he would have been alone with either of the two boys. The evidence as a whole indicated that it would have been difficult for Appellant to remove himself from such situations, but Dr. Gripon's testimony justified an inference that a reasonable person would do so under the circumstances. Therefore, there was evidence to support the jury's finding that Appellant was negligent. There was substantial expert testimony as to the effects of sexual abuse on young victims. It was also shown that the two young boys C.T.W. abused have already suffered great mental anguish and exhibit behavior typical of sex abuse victims. There was expert testimony that they will, in reasonable medical probability, suffer mental anguish far into the future. There is no evidence that anything other than Appellant's wrongful conduct caused these injuries to the boys. Therefore, the evidence supports the jury's finding of proximate cause. Appellant's first point of error is overruled.
Appellant argues under his third point of error that the evidence is legally and factually insufficient to support the jury's finding of gross negligence. The trial court's charge defined "gross negligence" as "such an entire want of care as to establish that the act or omission in question was the result of actual conscious indifference to the rights, welfare, or safety of the persons affected by it". Appellant argues that C.T.W.'s testimony was the only testimony relevant to this issue. C.T.W. testified that he never meant to harm the boys. He also said that at the time he was engaging in the sexual encounters with the boys, he did not think about the possibility that such conduct might cause them harm.
We find that there was other evidence relevant to the issue of gross negligence. Appellant continued these sexual encounters with the boys for several years. Dr. Gripon testified that pedophiles know that their conduct is wrong. C.T.W. destroyed evidence of his misconduct before it was detected by the boys' parents. C.T.W.'s own testimony established that he did not consider the possible harm to his victims. The other relevant evidence justified the jury's finding that he did so consciously. Appellant's third point of error is, therefore, overruled.
In support of his second point of error, Appellant urges that the trial court erred in defining the terms "negligence, ordinary care, and gross negligence" in terms of a person of ordinary prudence. Appellant argues that such definitions are *793 erroneous in that they did not take into account the mental illness he suffered. Appellant argues that in such cases the trial court should be required to define these legal phrases in terms of "an ordinary prudent person with the mental illness of pedophilia." He argues that to hold a person suffering from mental illness civilly liable under the standard of care of an ordinary prudent person results in liability without fault for a person who cannot control his offending conduct. Appellant admits that there is no authority in the case law of our state which supports this point of error. In Texas, even insane persons are held liable in tort cases on the same standards as any other adults. See Ross v. York, 233 S.W.2d 347, 348-349 (Tex.Civ. App.El Paso 1950, writ dis'm). Appellant admits he was not insane.
In criminal cases a defendant must show that at the time of the conduct charged, he was, as a result of severe mental disease or defect, not aware that his conduct was wrong. Tex.Penal Code Ann. § 8.01(a) (Vernon Supp.1991). The term "mental disease or defect" does not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct. Tex. Penal Code Ann. § 8.01(b) (Vernon 1974). The evidence is uncontroverted that pedophilia is just such an abnormality. Where the particular abnormality suffered by a defendant is not even a defense to criminal responsibility, it is not logical to conclude that his conduct should be judged under a lesser standard of conduct because of such abnormality in a civil proceeding which can only affect his property interests. We must adhere to the rule set out in Ross, supra. The trial court did not err in instructing the jury to assess Appellant's conduct in terms of an ordinary prudent person. Appellant's second point of error is overruled.
Appellant's fourth point of error urges that the trial court erred in charging the jury in that the special issues concerning negligence inquired as to the number of occurrences of negligence, which constituted a comment on the weight of the evidence. The special issues concerning negligence given to the jury were as follows:
How many different occurrences, if any, resulting in injury to [minor appellees] were proximately caused by the negligence, if any, of [Appellant].
Appellant argues that these special issues, by their emphasis on the number of occurrences, assume that negligence and proximate cause were proved. The record reveals that Appellant objected to special issue number one because it assumed that Appellant was negligent. However, Appellant did not complain in the trial court that this special issue assumed that any negligence the jury might find was a proximate cause of injury to D.G. Therefore, Appellant has waived his complaint that the issues assume the existence of proximate cause. Tex.R.Civ.P. 274. Appellant objected in the trial court that special issue number one assumed that Appellant was negligent. Special issue number one concerned whether Appellant was negligent with regard to D.G., the younger boy. After objecting to other portions of the court's charge concerning Appellant's liability to D.G. and damage issues concerning D.G., Appellant stated "where I have objected to question number one, show that I am objecting to question number one and five." Rule 274 of the Rules of Civil Procedure provides that "no objection to one part of the charge may be adopted and applied to any other part of the charge by reference only." Since the only objection Appellant made concerning special issue number five was made by reference to his prior objection to special issue number one, Appellant has presented nothing for review concerning special issue number five. See Christopher v. General Computer Systems, Inc., 560 S.W.2d 698, 705 (Tex.Civ.App. Dallas 1977, writ ref'd n.r.e.). Therefore, the only complaint concerning alleged defects in the special issues inquiring about negligence which we will address is Appellant's complaint that special issue number one submitted an issue that was not an ultimate issue in the case and assumed Appellant was negligent.
Appellant argues that special issue number one allowed the jury to assume that *794 Appellant was negligent on one or more occasions. We disagree. The phrase "if any" follows immediately after and modifies "negligence." This being the case, the jury could not assume Appellant was negligent on any occasion. See Texaco, Inc. v. Pennzoil Co., 729 S.W.2d 768, 810-811 (Tex.AppHouston [1st Dist] 1987, writ ref'd n.r.e.) cert denied 485 U.S. 994, 108 S.Ct. 1305, 99 L.Ed.2d 686 (1988). The jury could clearly answer the question with a zero if it found that Appellant was not negligent. While any number of occurrences of negligence more than one may have been superfluous, the jury was clearly asked to determine whether Appellant was negligent, which was an ultimate and controlling issue in the case. Therefore, the trial court did not err in submitting special issue number one to the jury. The jury's answer of "100" certainly constitutes a finding that Appellant was negligent. If there was any error committed, it was not reasonably calculated to cause the rendering of an improper judgment in light of the pleadings, evidence, and the charge as a whole. Texaco, supra, 729 S.W.2d at 811.
By his fifth point of error Appellant urges that the evidence was legally and factually insufficient to support the jury's finding that each minor Appellee was entitled to $200,000 in damages for loss of earning capacity. Appellant argues that there is no evidence or insufficient evidence of any such loss as well as the extent of such loss.
The expert testimony of Mr. Velardo and Dr. Gripon listed the temporary and long term effects of child sexual abuse. The evidence also reveals that each boy suffers from several of those well-known short term effects of such abuse. The older child, B.G., has exhibited indications of suicidal tendencies, lack of self-esteem, inability to relate normally to his peers, and fear that he may be homosexual. D.G., the younger boy, has killed small animals and lied repeatedly without any sign of remorse, manifests a precocious interest in sexual matters, vandalized a house, and shot at another child with a B-B gun.
Dr. Gripon testified that child victims of pedophiles have many of the problems common to others, but they are magnified for these victims and more likely to occur. They are more likely to be divorced, have drinking problems, and have difficulty maintaining jobs consistently. Such victims have problems establishing basic human trust. Gripon stated that where the abuse is repeated over a long period of time, the potential for damage is increased. Also, the more significant the abuser is to the child, the more damaging the incidents are. Dr. Gripon stated that, though he could not identify precisely which long term problems each child would suffer, the children would, more likely than not, be adversely affected by this experience. He testified that the abuse would likely have an impact on the boys' earning capacity. Mr. Velardo stated that these boys have a handicap for the future and will have permanent effects of this abuse for life, including psychological, emotional, and mental injuries.
In order for a plaintiff to obtain damages for loss of earning capacity, he must prove that his earning capacity has been harmed, and he must prove the amount of such damages with the degree of certainty to which it is susceptible. See Bonney v. San Antonio Transit Co., 160 Tex. 11, 325 S.W.2d 117 (1959). Where the plaintiff is a child who has never earned any money, the jury must determine the value of his lost earning capacity altogether from their common knowledge and sense of justice. Mclver v. Gloria, 140 Tex. 566, 169 S.W.2d 710 (1943). The expert testimony was sufficient to prove that the boys' earning capacity had been damaged. The jury's determination that each child had lost $200,000 in earning capacity in the future was not offensive to common sense or a reasonable sense of justice considering the entirety of the evidence. Appellant's fifth point of error is overruled.
Appellant's sixth point of error urges that the trial court erred in granting judgment in favor of Appellees for prejudgment interest, because pre-judgment interest is not recoverable for future damages *795 and the jury's findings did not segregate damages into separate amounts for past and future damages. The jury's verdict did not segregate the future and past damages. The Texas Supreme Court has held that where future and past damages are not segregated, a party may not recover pre-judgment interest. Cavnar v. Quality Control Parking, Inc., 696 S.W.2d 549 (Tex.1985). Appellee, however, argues that their right to pre-judgment interest in this case is not controlled by Cavnar, supra.
Subsequent to the decision in Cavnar, the legislature enacted Article 5069-1.05 § 6 of the Texas Revised Civil Statutes, which reads, in pertinent part, as follows:
Judgments in ... personal ... cases must include pre-judgment interest ... pre-judgment interest accrues on the amount of the judgment ...
This statute, by its own terms, applies to all actions commenced on or after September 1, 1987. Appellant argues that we should not hold that the statute alters the rule stated in Cavnar, supra, because to do so would work an injustice in awarding interest in a manner found unfair in Cavnar. Though part of the damages may have not accrued at time of trial, the legislature clearly has decided to allow parties to recover pre-judgment interest on the entire judgment. We must presume they were aware of the Cavnar decision when they enacted the new statute regulating the awarding of pre-judgment. See Woodward v. Ortiz, 150 Tex. 75, 237 S.W.2d 286 (1951). If the legislators were aware of Cavnar, they could have hardly used language which more clearly expressed a desire to allow a party to recover pre-judgment interest on the entire amount of the damages he is awarded in the judgment. We hold that Article 5069-1.05 § 6 allows a party to recover pre-judgment interest on all of his actual damages. The trial court did not err in awarding pre-judgment interest. Appellant's sixth point of error is overruled.

Some Issues and Contentions Revisited
The Appellant admitted that he had shown X-rated movies or pornographic movies or pornographic devices to B.G., and that this practice went on for several years. C.T.W., the grandfather known as "pawpaw", talked sex a lot and skinnydipped over a considerable period of time with B.G. W. admitted that on more than one occasion he hooked up a vacuum cleaner to his own penis and encouraged B.G. to do the same. It should be stressed that there were numerous occasions when the contents of a certain box or trunk were shown by C.T.W. to B.G. The trunk contained pornographic magazines and sexual devices.
After B.G. had begun to go through puberty, then the relationship with C.T.W. ceased. The stepgrandfather, C.T.W., then became interested in the younger child, D.G. The activities with the younger child lasted for a period of about a year and a half. The sexual activity with D.G. became more advanced. The stepgrandfather had oral sex with the younger boy, which included putting the grandfather's mouth on the young child's penis and also included the younger boy placing his mouth on the grandfather's penis. The stepgrandfather saw the stepgrandsons on a regular basis. The stepgrandfather could not remember whether some of the sexual activities happened more than one time within a single day. The encounters with D.G. occurred when D.G. was approximately 6-V2 or maybe 7 years of age. The first encounters with B.G. occurred when the boy was 8. The stepgrandfather unequivocally testified that these sexual encounters were numbered in the hundreds. Pawpaw, as he was called, admitted that he could see that what had happened between him and the two young boys could or might create problems for the boys.
The older son had definite problems concentrating on his school work. He didn't finish assignments. The younger boy engaged in some bizarre behavior. He would take a pet turtle and crush it with a hammer. He would peal the back shell off of the turtle. The younger son would take his own pet hamster and stick one of the smaller Chinese chopsticks into the rectum of the hamster. He would squish frogs. *796 None 01 these activities seemea to bother or disturb the younger son.
At one point when the father of the younger son confronted the Appellant with the narratives told by the younger son, the Appellant advised the father to get help for the boy. The Appellant also said that he was going to try to get help for himself. Appellant realized that he needed some sort of help or professional counseling. The younger son, while watching a television program, will walk to the TV set and touch the private areas of a female.
The younger son at 8 years of age had helped a friend of his seriously vandalize a vacant house. Every chandelier in the home was destroyed. Many holes were poked into the walls of the home. The doors were destroyed. The commodes or toilets were broken or destroyed. The water in the house was turned on. The home was flooded. The house was described as being in shambles. When asked about this vandalism, the younger son showed no remorse, sorrow or sadness over what he had done. The younger boy had killed a number of the family's goldfish. He didn't know why he had killed them. He did not seem sorrowful. The record reflects that C.T.W. on more than one occasion realized that he had a problem and probably needed professional help. He failed to obtain such help. Since he realized that he did have a problem, being a serious one, the jury could consider that he had been negligent in failing to obtain counseling or professional help to cope with or solve his serious problem.
A paramount purpose of the law of torts is to safeguard certain rights and privileges and to preserve and protect the rights and privileges of individual citizens against the wrongful acts of other persons. Basically, Texas tort law affords redress and recompense for wrongful acts that affect, diminish or destroy a legal, lawful interest of the party-plaintiff. In our State, the right to privacy and certainly the right to personal privacy is an acknowledged legal, protected interest. See Billings v. Atkinson, 489 S.W.2d 858 (Tex. 1973). An unlawful and criminal invasion ot the right to privacy gives rise to a remedy for such legal injury. Id. The activities or acts or C.T.W. constituted an invasion into the young boys' personal privacy. We conclude that it is a sound rule of law that a negligent invasion of privacy is a compensable cause of action under this record. This, we think, is a salutary rule, especially if the intrusion into the personal and private affairs causes the young person to suffer emotional distress and other emotional upsets resulting in bizarre behavior and injuries.
An intrusion or violation of personal privacy can be brought about negligently and, of course, also intentionally. The right to recover damages for a tortious injury or invasion does not depend upon solely whether the injury was inflicted for the then-conscious purpose of damaging the injured party. A negligent infliction of harm with the harm being a natural result is a compensable cause of action. Hence, liability in an invasion of privacy suit may be based upon negligence; and the same can be based upon intentional intrusions.
In the case of St. Elizabeth Hospital v. Garrard, 730 S.W.2d 649 (Tex. 1987), our Supreme Court announced that the Texas law was in harmony with a recognized trend in other jurisdictions which did recognize a tort of negligent infliction of mental anguish. This tort of negligent infliction of mental anguish and suffering existed without arbitrary restrictions on monetary damages as a means of recovery.
We therefore conclude that both the negligent invasion of privacy as well as the negligent infliction of emotional distress are each recognized causes of action. Furthermore, we hold that even though an act or action may be viewed as intentional, nevertheless, negligence can arise in the failing to appreciate on the part of the initiating actor that harm would be inflicted upon the young boys and that the negligence in failing to exercise due and ordinary care in this regard is a foreseeable matter and under this unusual record was a basis of the proximate cause issues. Plainly and briefly stated, the Appellant was under a legal obligation or duty not to *797 pursue or persist over several years duration certain invasions and intrusions into the boys' rights which would in turn result in foreseeable harm and injuries to the young boys. The stepgrandfather, originally and affectionately known as "pawpaw" to the boys, was under a recognizable duty to use ordinary care in the recognition of a danger which would culminate in probable personal injuries and damages to young children such as these. One of the lads involved was only about 6 years old.
Therefore, if the facts, incidences and intrusions are such that an adult person of ordinary, common sense and knowledge could or should realize that if he, as an adult person, did not use ordinary care in his continued acts or actions with regard to and in relationship to the resulting injuries, damages, hurts and emotional harms to the young boys, he then should have realized that his long-term intrusions would place the young lads in danger of harmful effects. This being the case, then the legal obligation and duty to use ordinary care to avoid such disastrous injuries and harms arises. See Bennett v. Span Industries, 628 S.W.2d 470 (Tex.Civ.AppTexarkana 1981, writ ref'd n.r.e.). Under this record and under the testimony of the experts as well as the lay witnesses, Appellant could have reasonably foreseen the likelihood of emotional upsets, hurts and harms to the two young children involved.
When, as here, the basic facts and the fundamental elements of the litigation are uncontroverted then the question of a legal duty becomes a question of law. We find and conclude that a legal duty did exist as to and on the part of C.T.W. Mitchell v. Missouri-Kansas-Texas R. Co., 786 S.W.2d 659 (Tex. 1990), cert. denied, ___ U.S. ___, 111 S.Ct. 247, 112 L.Ed.2d 205 (1990); Otis Engineering Corp. v. Clark, 668 S.W.2d 307 (Tex.1983).
The record reflects that a psychiatrist gave testimony before the jury. A major thrust of the psychiatrist's testimony was that an individual, diagnosed with pedophilia, or an individual with the type of interest in young boys as shown in the record to have been possessed by C.T.W.that individual recognizes that such type of interest is wrong. However, this recognition of the wrong is not to be associated with insanity and these types of individuals with this problem could and should seek help. They realize this need. Some do seek professional help.
However, the more common situation is that individual persons with psychosexual disorders usually seek help when these same persons get into some sort of legal difficulty. The psychiatrist further testified that in this case the children were young. In fact, they were very young. Typically, these children have an aspect of bonding with some older adult. But they are betrayed in this bonding. Children of this tender age are virtually powerless to stop these practices. But these experiences take away from the young children a lot of their innocence and a lot of their ability to be a child.
These practices engaged in by pedophiles thrust these young children into a very adult-like world. These practices cause them to distrust some people and in many cases, very damaging harm results from a psychiatric or psychological standpoint. It adversely affects their relationships even with their parents or their peers and in the future with their potential spouses.
The psychiatrist's further expert testimony was that the fact that these practices went on for a long period of time and that the practices were repeated with the young boys made the situation one of increased intensity. Such a situation of grave intensity does have an effect on the long-term and short-term sequelae to be experienced by the young boys.
Scientific studies in the past have tended to show that such experiences of such intensity involving sexual abuse over a duration of time results in the young boys experiencing a higher risk of developing homosexuality later in life. The specialty of psychiatry and other medical fields recognize that there is a higher frequency of individuals who have been abused as children that later become child abusers themselves. In the specialty of this particular expert, it is calculated that any encounter *798 of the type as renected in this record would be damaging to the young boys. The record reflects that such experiences visited upon young boys handicaps these young children. These aberrant experiences may be looked upon almost like a physical injury and such experiences can be seriously disabling and handicapping to the person. This concept is especially true in that person's emotional make-up. One example is that these young boys have very little selfesteem. As a result, these young lads can likely experience a very poor self-concept, a very poor self-image, and very low self-esteem.
We conclude that the trial court correctly submitted this case in the court's charge. We conclude that the well-established definitions of "Negligence" and "Ordinary care" were correct. We have carefully considered the Appellant's orally dictated objections to the charge. Although we do not find where the Appellant properly pressed for a ruling of the trial judge, we will, nevertheless, consider the objections. In any event, virtually the same issues and contentions were submitted in the transcript as defendant's requested instructions, both of which were refused. The defendant's requested instructions on the meaning of negligence is as follows:
"Negligence," when used with respect to the conduct of a person with a mental illness, such as pedophilia, means failing to do that which an ordinary prudent person with that illness and of the same capacity, would have done under the same or similar circumstances, or doing that which such a person would not have done under the same or similar circumstances.
The defendant's requested instruction on the meaning of ordinary care is as follows:
"Ordinary care," when used with respect to the conduct of a person with a mental illness, such as pedophilia, means that degree of care which an ordinary prudent person, with that illness and of the same capacity, would have used under the same or similar circumstances.
We determine that the trial court correctly refused these definitions or instructions. lhey were not substantially correct. They failed to set out the correct standard. The evidence is in conflict as to what is the meaning of pedophilia. Pedophilia is not a word in common usage. No definition of this technical medical or psychiatric word was proffered.
Reasoning by analogy, which analogy we think is logically sound, we opine that in an automobile collision personal injury case the hypothetical person of ordinary prudence is utilized in the definitions of negligence and ordinary care. Say the offending motorist was a person of great brilliance and genius and possessed an extremely high intelligence quotient. The ordinarily prudent person standard would nevertheless apply. By parallel reasoning and equal, balanced logic let us say the offending motorist was a rather dull or oafish dolt. This second offending motorist had a substandard I.Q. Nevertheless, again the ordinary prudent person standard is applicable.
As an additional and independent reason for an affirmance, if we accept the Appellant's theory of the case and his definitions and instructions, we imperil children of very tender age and young boys of 6 or 7 to 11 would be either remediless or virtually remediless. Also Appellant's position would leave children of very tender age and of a trusting, credulous nature without effective recourse in many cases to redress injuries and wrongs done to them. Nor do we observe that the Appellant's definitions were proffered or made applicable to the issue of proximate cause. See Tex.R.Civ.P. 272.
On the verbal objections made to the court reporter, we fail to find that the complaining party obtained from the trial court an announcement of its rulings thereon. Of course, any objection to one part of the charge may not be made applicable to another part of the charge by reference or implication only. Tex.R.Civ.P. 274. We also recognize the mandate of Rule 277 that the trial court shall, whenever feasible, submit the cause on broad-form questions. Unquestionably the submission of definitions and instructions must be substantially *799 correct. Tex.R.Civ.P. 278. Such definitions and instructions should relate to a complete defense or ground of recovery.
The judgment of the trial court is affirmed.
AFFIRMED.