**TEXAS DEPARTMENT OF HUMAN SERVICES of the State of Texas, Appellant,**

v.

**Gary HINDS, Appellee.**

**No. 08–92–00314–CV.**

Court of Appeals of Texas, El Paso.

June 21, 1993.

Rehearing Overruled Oct. 13, 1993.

Dan Morales, Atty. Gen. of Texas, Edwin N. Horne, Asst. Atty. Gen., Gen. Litigation Div., Austin, for appellant.

Howell Cobb, III, El Paso, for appellee.

Before KOEHLER, BARAJAS and LARSEN, JJ.

## *OPINION*

BARAJAS, Justice.

This is an appeal from a suit brought pursuant to Texas Revised Civil Statutes, Article 6252–16a, more commonly referred to as the Texas "Whistleblower" Act. Trial was by jury. The Texas Department of Human Services of the State of Texas, Appellant, attacks the judgment in favor of Gary Hinds, Appellee, by nine points of error. We reform the judgment of the trial court and affirm the judgment as reformed.

## I. *SUMMARY OF THE EVIDENCE*

Gary Hinds, Appellee, worked for the Texas Department of Human Services ("TDHS") for twelve years as an Eligibility Caseworker I at their offices located in El Paso. Appellee's duties required him to conduct interviews with potential clients and process their applications to determine their eligibility for various federal and state assistance programs.

In an effort to properly safeguard the expenditure of federal funds, the Federal government elected to maintain close scrutiny of the accuracy with which State employees make benefit determinations of eligibility. In the early 1980's, the Federal government began to "threaten" states which compiled unacceptable error rates, including Texas, with funding sanctions or the withholding of funds. In response, Texas initiated its corrective plan that included completion of a form or document known as the "Service Review Instrument" or "SRI". Texas developed the SRI in an attempt to improve the quality of caseworker evaluation and the pro-

cessing of client cases. In addition, the SRI was designed to improve the quality of documentation, assist a caseworker's understanding of the case history, and provide an objective source for evaluating the quality of worker documentation. As a part of the SRI program, the main office of TDHS in Austin randomly selected five of each worker's cases on a monthly basis, and reviewed the case files to ensure appropriate documentation had been obtained, and all other pertinent information processed. By doing so, the main office at Austin sought to identify common errors being made in the field, reduce errors in eligibility determination, and ultimately avoid the potential imposition of any federal sanctions.

In July or August of 1987, Ralph Briones, one of Appellee's supervisors, instituted a policy whereby caseworkers under his direction were requested to review the cases "randomly" pulled by the main office in Austin before the main office actually reviewed the files. As part of this practice, Briones permitted and encouraged caseworkers to fix or supplement any documentation that had been previously omitted when the case was originally processed. Appellee was requested to perform such a review of his own cases that had been "randomly" pulled, and he did so. Two days later, Appellee questioned the practice to his immediate supervisor, Oscar Peregrino. On September 1, 1987, Appellee again raised questions, this time with Briones directly, who allegedly stated, " 'you know I think that's illegal.' " Thus, the record shows that over the course of a year and a half, Appellee purportedly made reports to Peregrino once, Briones on two occasions, Briones' supervisor Antonio Ortiz once, and Ortiz' supervisor, James Harvey, once.

According to Appellee, Briones reacted negatively when he initially questioned the practice. In addition, there appeared to be immediate retaliation by Briones toward Appellee. Other co-workers also noticed a pattern of retaliation toward Appellee. In October of 1987, Appellee received his first adverse personnel action in twelve years of employment with TDHS. In January 1988, Appellee received his first unfavorable employee review. Later, after he perceived increased pressure and retaliation, Appellee submitted his resignation.

## II. DISCUSSION

In Point of Error No. One, TDHS asserts Article 6252–16a fails to adequately waive the State's sovereign immunity from suit. *See Duhart v. State*, 610 S.W.2d 740, 742 (Tex. 1980) ("It is a well-established rule that for the Legislature to waive the state's sovereign immunity, it must do so by clear and unambiguous language."). TDHS argues that the Act only permits suit against individual state or local officials and not against the governmental entity itself as employer. The issue presented in this initial point of error, then, is whether the Act—reading entirely in terms of governmental acts—creates only a cause of action against governmental officials.

The Third Court of Appeals recently addressed the identical issue. *Texas Department of Human Services v. Green*, 855 S.W.2d 136 (Tex.App.—Austin, 1993, n.w.h.). The Third Court examined this question in reference to the Act's two legislative purposes:

(1) to protect public employees from retaliation by their employer when, in good faith, employees report a violation of law; and

(2) in consequence, to secure lawful conduct on the part of those who direct and conduct the affairs of public bodies.

*Green*, 855 S.W.2d at 142; *citing Travis County v. Colunga*, 753 S.W.2d 716, 718–19 (Tex.App.—Austin 1988, writ denied). To effect the first goal, the Court noted that the legislature directed the proscription at governmental entities. For example, the statute specifically provides in Section 2:

A state or local governmental *body* may not suspend or terminate the employment of, or otherwise discriminate against, a public employee who reports a violation of law to an appropriate law enforcement authority if the employee report is made in good faith.

In Section 1(3), the Article further provides;

'Public employee' means a person who performs services for compensation under a

written or oral contract for a state or local governmental body.

Tex.Rev.Civ.Stat.Ann. art. 6252–16a (Vernon Supp. Pamphlet 1993). The Court then found that directing the focus of the statute at governmental bodies is "wholly consistent" with the second goal. *Green*, 855 S.W.2d at 142. Finally, the Court held that the provisions of the Whistleblower Act unambiguously direct the penalties of the Act at the governmental entity and not individual officials and further unambiguously waives the states governmental immunity. *Id.* at 142–43.

■ We agree with our sister court's conclusion that the Legislature is presumed to have chosen the statutory language with care and that every word in a statute is presumed to be intentionally used with meaning and purpose. *Green*, 855 S.W.2d at 142–43; *see also Chastain v. Koonce*, 700 S.W.2d 579, 582 (Tex.1985). Therefore, we also find it significant that the statute only mentions individual supervisors in one section, i.e., Section 5(a). That section provides for a civil penalty against individual supervisors who violate the Act. However, the attorney general or appropriate prosecuting attorney sues to collect the penalty, and the employee receives no benefit. Thus, we agree that the absence of any other reference to individual supervisors "constrains us to interpret the Act's other sections as excluding additional liability of supervisors when the legislature has not done so." *Green*, 855 S.W.2d at 142–43. Appellant's first point is overruled.

In Points of Error Nos. Two and Three, Appellant contends there is legally and factually insufficient evidence to support the jury's findings that Appellee made "a report in good faith of an illegal act" and that the alleged retaliatory acts were in response to these reports. We disagree.

As set out above, the evidence establishes that Appellee made several reports over the course of a year and a half regarding the practice of supplementing the SRI. During the course of these reports, Appellee described the practice as "troubling," "cheating," "dishonest," "most probably illegal" and according to the testimony of one of his immediate supervisors, Ralph Briones, "illegal." Nevertheless, TDHS attempts to discredit this evidence by labeling it as "passive," making only "vague" references to any illegality. We find these contentions to be wholly without merit.

■ Case law addressing the Whistleblower Act, provides that the Act will be construed liberally to accomplish its remedial purpose. *Castaneda v. Texas Dep't of Agric.*, 831 S.W.2d 501, 504 (Tex.App.—Corpus Christi 1992, writ denied). Moreover, a "report" is defined as "any disclosure of information regarding a public servant's employer tending to directly or circumstantially prove the substance of a violation of criminal or civil law, the State or Federal Constitution, statutes, administrative rules or regulations." *Castaneda*, 831 S.W.2d at 501, 504. The statute does not require a party to make the report in any particular manner, only that there be one; and we will not engraft additional reporting requirements onto the statute. *Id.* Further, regarding Appellee's good faith belief that a legal violation occurred, it is enough that the evidence show that belief, regardless of whether it is in fact a technical violation of law. *Id.; Lastor v. City of Hearne*, 810 S.W.2d 742, 743–44 (Tex. App.—Waco 1991, writ denied) (employee who reported in good faith that a violation had occurred, but was wrong about the legal effect of the facts, held still able to recover). We find the evidence in this case to be sufficient to establish that Appellee made a report in good faith of illegal activity.

■ Appellant further asserts there is legally and factually insufficient evidence to support a causal connection between Appellee's reports and any subsequent retaliation. Again, we find this assertion to be without merit. During Appellee's meeting with Briones in September of 1987, Briones noticeably "stiffen[ed]" when Appellee questioned the SRI policy, and Briones admitted he exhibited an adverse reaction during this conversation. This response caused Appellee to worry about the fallout from his report.

Two days later Oscar Peregrino, after mentioning he had discussed Appellee's September meeting with Briones, stated,

Ralph [Briones] said they are going to have to start cracking down around here. For one thing, you're going to have to start coming in to work on time and for another thing, I'm going to have to start reading more of your cases because you're having these low S.R.I. gradings and for another thing, he says, I can't loan you my key to the office on weekends.

Appellee testified his work atmosphere began to change. Briones instituted increased supervisory scrutiny of Appellee's work by Peregrino, resulting in additional workload, added delay in processing of client benefits, but with less assistance to Appellee when he was confronted with unusual cases. Briones did this purportedly due to Appellee's low statistics; but his accuracy ranged from 80–100 percent in the months preceding his report to Briones. The record shows that Peregrino even told Appellee that Briones had taken these actions in reaction to the report.

Approximately one month later, in October of 1987, Appellee received his first employee reprimand in twelve years. Appellee then met with James Harvey, the regional director, concerning the reprimand, and reported the SRI policy to him. The practice stopped. But the atmosphere in the work place continued to deteriorate. Other employees testified that the office often categorized certain employees as "disfavored" and subjected them to differential treatment and that Appellee was subjected to retaliatory treatment. We find there is sufficient evidence linking Appellee's reports to the subsequent retaliation. Points of Error Nos. Two and Three are overruled.

■ In Point of Error No. Four, Appellant asserts the trial court erred in overruling their proffered jury instruction on the issue of retaliation. TDHS sought an instruction that provided;

You are instructed that the reporting of these activities must have been the principal reason for the Texas Department of Human Services retaliation. You are instructed that "the principal reason" means that the reporting of a violation of law was the cause of the harassment or discrimination.

Question No. 2, to which the instruction would have been added, read as follows:

Did the Department of Human Services constructively terminate, or otherwise discriminate, against Gary Hinds in retaliation for his report that advance correction of SRI case files was illegal? [Emphasis added].

The issue then is whether a question already requiring the jury to find that TDHS "fired" Appellee for his reporting activity, further necessitates an explanatory instruction. A similar issue was decided in *Green.* We find, as did the Third Court of Appeals, that the proposed instruction adds nothing. *Green,* 855 S.W.2d at 149–50. Moreover, submission of Question No. 2 comports with a similar question approved in *Ingleside v. Kneuper,* 768 S.W.2d 451, 453 n. 1 (Tex.App.—Austin 1989, writ denied). It is also consistent with submission practices followed in employer–retaliation cases brought under the Workers' Compensation Act. *See* TEX.REV.CIV.STAT. ANN. art. 8307c (Vernon Supp. Pamphlet 1993); 2 STATE BAR OF TEXAS PATTERN JURY CHARGES PJC 29.01 (1989); *see also Santex v. Cunningham,* 618 S.W.2d 557, 558–59 (Tex.Civ.App.—Waco 1981, no writ). Again, we will not "engraft" upon the statute and find error for failing to submit an instruction not contained in, or reasonably to be inferred from, statutory language or Texas law. Point of Error No. Four is overruled.

Appellant's fifth point of error challenges the legal and factual sufficiency of the evidence to support the jury's finding of mental anguish. Prior to reaching the propriety of this attack, it is helpful to preface the issue with a brief overview of the law regarding mental anguish as a separate element of damages.

■ At the outset, mental anguish is a compensable injury for which damages may be awarded. The process of awarding damages for such an injury is difficult because mental anguish constitutes a subjective, non-pecuniary loss. Since mental anguish is a non-pecuniary loss, the amount awarded is generally within the broad discretion of the jury. Such discretion necessarily carries with it the risks of passion, prejudice, speculation, and bias. Despite these risks, this

Court has previously held that once the existence of some amount of mental anguish has been established, a jury's subsequent award of damages is virtually unreviewable. *Worsham Steel Co. v. Arias*, 831 S.W.2d 81, 85 (Tex.App.—El Paso 1992, no writ); *Brown v. Robinson*, 747 S.W.2d 24 (Tex.App.—El Paso 1988, no writ).

In reviewing the sufficiency of evidence to support Appellee's award for mental anguish, we are guided by the definitions espoused by this Court as well as other appellate courts throughout our state. Specifically, mental anguish has been defined in such a way as to imply:

[A] relatively high degree of mental pain and distress; it is more than mere disappointment, anger, resentment, or embarrassment, although it may include all of these, and it includes mental sensation of pain resulting from such painful emotions as grief, severe disappointment, indignation, wounded pride, shame, despair and/or public humiliation.

*Worsham Steel Co. v. Arias*, 831 S.W.2d at 85–86, citations omitted.

Even though the definition of mental anguish has at times been described as "unwieldy," and a matter of semantics, it is clear that appellate courts have interpreted it in such a way as to produce a common thread in sufficiency cases. *Compare State Farm Mut. Auto. Ins. Co. v. Zubiate*, 808 S.W.2d 590, 600–601 (Tex.App.—El Paso 1991, writ denied) (plaintiffs felt intimidated, confused, frightened, "betrayed, scared, angry and devastated" and were "unable to sleep" held sufficient to prove mental anguish); *Skaggs Alpha Beta, Inc. v. Nabhan*, 808 S.W.2d 198, 202 (Tex.App.—El Paso 1991, no writ) (plaintiff descriptively testified that she suffered chronic headaches that affected her domestic environment and had trouble sleeping); *J.B. Custom Design and Bldg. v. Clawson*, 794 S.W.2d 38, 43 (Tex.App.—Houston [1st Dist.] 1990, no writ) (plaintiffs experienced "a tremendous amount of mental anguish, embarrassment, and distress" held legally and factually sufficient to support award for mental anguish); *City of Ingleside v. Kneuper*, 768 S.W.2d 451, 460 (Tex.App.—Austin 1989, writ denied) (plaintiff, among other things, was in "total panic" and "great fear," was "nervous and irritable," and he would "bite his nails" and "pace the floor" held legally and factually sufficient to support award for mental anguish); *Kneip v. Unitedbank–Victoria*, 734 S.W.2d 130, 134–36 (Tex.App.—Corpus Christi 1987, no writ) (plaintiff, among other things, suffered from loss of sleep and headaches held sufficient to support award for mental anguish) *with Worsham Steel Co. v. Arias*, (plaintiff who said that he felt "sad" and that "it was very sad" to be terminated, did not show required level of distress to be entitled to award for mental anguish). In short, Texas courts have interpreted the definition of mental anguish to mean that recovery is warranted in such cases where the plaintiff's mental pain has resulted from a myriad of negative emotions. *Worsham Steel Co. v. Arias*, 831 S.W.2d at 86.

■ With the definitional requirements for mental anguish outlined above, it is now necessary to review the evidence contained in the record. Testimony relating to mental anguish purportedly suffered by Appellee, as shown in its entirety as follows:

Q: In your petition, you alleged that you got mental anguish as a result of the event leading up to and resulting in the termination of August of 1988. What kind of anguish have you gone through since then?

A: Since termination or since departure, or—

Q: Yes, sir.

A: All of the effects one would experience in being without a job and not being able to find one. And just—I don't know really how to put a label on it. I think most people would, in that sort of situation, know that at my age too, that in the eyes of the world, it might be that you're perceived as a failure or a deadbeat and so forth and so you would internalize that. You know, without being a mind reader—someone would suppose that people—

[Defendant' Attorney]: Your Honor, I'm going to have to object to this line of questioning 'cause he's not qualified to give that kind of response. He can tell how be feels.

[Plaintiff's Attorney]: That's what I'm asking, Your Honor.

Q: How do you feel, as a result, since your termination with the Department of Human Services? What kind of problems has it caused you?

A: Well, I have financial problems, of course, related to the lack of work. And at first I didn't really feel it directly because I had two or three months later,—I guess, two months later received a retirement refund which was approximately 15,000 and so I was able to keep things going that way.

And I think I had, well, maybe $3,000.00 in the bank at that time. So with the refund and the savings, I was able to hold my head up, so to speak. But like all money, that money disappeared in time and I had to rely on relatives for loans.

Q: What kind of suffering or anguish have you gone through since loosing [sic] your job?

A: I really don't know how to put a word on it. Humiliation I suppose or victimization or something. I don't know how to word it in a clinical way.

Q: We can only utilize what you can express. What humiliation, what victimization have you—

A: Well, this idea that you're—because of the way this came about, to people who only know the other side, it looks like you deserved to lose your job. So it puts you in the position of either going around all the time and explaining to people that it didn't happen that way, which would be—a person wouldn't do that. You can't live your life explaining to everyone, 'I'm really not a bum, or a deadbeat or a failure.' So this puts you in that position that you feel like—I can't think of a word to nail it down, but in general that was the feeling.

Reviewing only the evidence that supports the jury's finding, and in deference to that finding, we find that the above testimony constitutes more than a "scintilla" of evidence. Moreover, review of such evidence and the record as a whole reveals evidence that Appellee felt humiliation, victimization, and the feeling that people viewed him as a failure or a deadbeat. He additionally testified that people perceived him as deserving to lose his job and that such perception required him to explain to everyone that he was not really a bum. We find the evidence to be factually sufficient to support an award for mental anguish. Appellant's Point of Error No. Five is overruled.

In Point of Error No. Six, Appellant complains there is legally and factually insufficient evidence to support the jury's finding of lost future earning capacity.[1] The jury awarded $127,541.14 as lost future earning capacity.

The amount awarded for future damages is largely left to the discretion of the jury and is entitled to great deference, *Romero v. CMA, Inc.,* 808 S.W.2d 157, 159 (Tex.App.—El Paso 1991, writ denied). And, damages for loss of earning capacity do not have to be based on any specific degree of physical impairment, but can be based on a composite of all factors affecting earning capacity. *Tri–State Motor Transit Co. v. Nicar,* 765 S.W.2d 486, 492 (Tex.App.—Houston [14th Dist.] 1989, no writ). As there is no general rule regarding awards for lost earning capacity, each case must be judged on its particular facts and the damages proved with that degree of certainty of which the case is susceptible. *Armellini Exp. Lines of Florida, Inc. v. Ansley,* 605 S.W.2d 297, 313 (Tex. Civ.App.—Corpus Christi 1980, writ ref'd n.r.e.).

The record in the instant case shows that the only evidence presented regarding future earning capacity was Appellee's monthly earning capacity, coupled with his testimony that he was unable to find work after his termination, had had no earnings since that time, and was required at times to rely on relatives for loans. It is well established that the measure of damages for lost earning capacity is the diminished earning power or capacity of the plaintiff, not

---

1. Although Appellant's point of error attacks the jury's finding of lost wages, the substance of their argument attacks only loss of future earning capacity. Moreover, they preserved error only as to the jury's finding on future earning capacity.

their *actual* lost earnings. *Southwestern Bell Telephone Co. v. Wilson*, 768 S.W.2d 755, 763 (Tex.App.—Corpus Christi 1988, writ denied). Although the evidence is limited, it is conceivable the jury determined that Appellee, being 60 years of age at time of trial and unemployed since his termination at age 56, had experienced a near total loss of earning capacity amounting to the sum of his annual salary. Thus, their award would reflect his annual salary multiplied by the number of years he had until age 65, the year he planned to retire plus possible raises or other increases for which Appellee was eligible.[2] *See Adams v. Petrade Int'l, Inc.*, 754 S.W.2d 696, 710 (Tex.App.—Houston [1st Dist.] 1988, writ denied) (mental processes by which jury determines amount of damages is ordinarily not cognizable by appellate court; where the law furnishes no precise legal measure for recovery of damages, amount to be awarded is largely discretionary). In addition, the jury may have considered the effects of inflation and the constant decrease in the value of a dollar. *See Texas Const. Serv. Co. of Austin, Inc. v. Allen*, 635 S.W.2d 810, 812 (Tex.App.—Corpus Christi 1982, writ ref'd n.r.e.); *Allied Stores of Texas, Inc. v. McClure*, 622 S.W.2d 618, 619 (Tex.App.—Tyler 1981, no writ). We find that the jury's finding is supported by some evidence and is not so against the great weight and preponderance of the evidence as to be manifestly unjust. Consequently, Point of Error No. Six is overruled.

■ In Points of Error Nos. Seven and Eight, Appellant asserts there is legally and factually insufficient evidence to support the jury's finding of malice and the award of exemplary damages based on that finding. However, the evidence, as set out above, clearly supports the jury's finding. Appellee testified to a pattern of retaliation beginning after he made his initial reports to Peregrino and Briones and continuing until he was finally forced to resign. Singling him out for this treatment, in full view of other employees who also noticed the adverse response, is sufficient to support the finding of malice. Points of Error Nos. Seven and Eight are overruled.

In Appellant's ninth and final point of error, it contents that the trial court erred in granting pre-judgment interest on future damages and further asserts the trial court erred in failing to discount the future damages to present value.

■ The question regarding pre-judgment interest on future damages is one which is currently being considered by the Texas Supreme Court. *See C & H Nationwide, Inc. v. Thompson*, 810 S.W.2d 259, 276 (Tex.App.—Houston [1st Dist.] 1991, writ granted) (holding that pre-judgment interest in wrongful death cases is recoverable); *C.T.W. v. B.C.G.*, 809 S.W.2d 788, 795 (Tex.App.—Beaumont 1991, no writ) (holding pre-judgment interest on future *actual* damages recoverable). Insofar as we have upheld the jury's findings on actual damages, we likewise find it proper for the trial court to award pre-judgment interest on those damages.[3] We find that the trial court did not err in granting pre-judgment interest on future damages.

■ The Appellant further contends the trial court erred by not discounting future damages to present value. There is no question but that awards for future damages should be reduced to present value. *Republic Bankers Life Ins. Co. v. Jaeger*, 551 S.W.2d 30, 31 (Tex.1976); *Taylor Pub. Co. v. Systems Marketing Inc.*, 686 S.W.2d 213, 217 (Tex.App.—Dallas 1984, writ ref'd n.r.e.). Moreover, the Supreme Court has removed

---

**2.** The evidence at trial proves that Appellee's base monthly salary plus longevity pay at the time of his termination was $1,657 per month. In addition, he received various benefits including state-paid contributions toward insurance ($102) and OASI ($80.44). He also accrued 18 hours of sick leave per month valued at $172.08 per month (computed by multiplying $1,657 by 12 months divided by 2080 hours per work-year = $9.56 per hour, times 18). Adding those figures totals $2011.52 per month. Further multiplying that monthly total by 56 (the number of months remaining from time of trial until Appellee reached 65 totals $112,645.12.

**3.** Although Appellee "concedes" that it was improper for the trial court to award pre-judgment interest on the punitive damages, a reading of the trial court's judgment reveals that pre-judgment interest was in fact only assessed on the amount of actual damages.

the discount rate from the fact finder as a controlling issue, and the trial court may determine the present discount rate absent specific evidence of that rate as the rate is provided by statute. *See Taylor*, 686 S.W.2d at 217. *Ponton v. Watson*, 695 S.W.2d 68, 70 (Tex.App.—Corpus Christi 1985, no writ); TEX.REV.CIV.STAT.ANN. art. 5069–1.03 (Vernon 1987). Thus, we find the trial court erred in not discounting future damages to present value, and sustain Appellant's Point of Error No. Nine as it related to the failure to discount future damages.[4] We reform the judgment of the trial court to reflect the award of future damages, discounted by present value, to be in the amount of $118,-912.81.

Having overruled Appellant Points of Error Nos. One through Eight, and having sustained Point of Error No. Nine as the point relates to the trial court's failure to discount damages, the judgment of the trial court is reformed to reflect the award of future damages in the amount of $118,912.81. Further, we affirm the judgment as reformed.

KOEHLER, J., dissenting.

KOEHLER, Justice, dissenting.

I respectfully dissent from the majority opinion, specifically as to the overruling of Appellant's Point of Error No. Five which asserted that there was no evidence or insufficient evidence of mental anguish to support the jury verdict. If there was any evidence more than a scintilla, it was clearly insufficient to support the jury's finding in that respect and I would thus reverse with re-

spect to that finding and either order a remittitur or a remand.

The development of the theory of damages for mental anguish could be an act in "A Funny Thing Happened On The Way To The Forum."[1] Just as in other areas of the law, some of the changes and developments in the law pertaining to mental anguish make logical sense and others just happened. It was not too many years ago that the Supreme Court held that a party could not recover for mental anguish in the absence of some objective injury connected with a crime or tort because both its existence and extent could be established only by the word of the injured party. *Harned v. E–Z Finance Co.*, 151 Tex. 641, 254 S.W.2d 81 (1953).[2] Such cases as *Cactus Drilling Co. v. McGinty*, 580 S.W.2d 609 (Tex.Civ.App.—Amarillo 1979, no writ) and *Ryder Truck Rentals v. Latham*, 593 S.W.2d 334 (Tex.Civ.App.—El Paso 1979, writ ref'd n.r.e.) held that in order to recover for mental anguish, a plaintiff must show more than mere worry, anxiety, vexation or anger; there must be evidence of "intense pain of body or mind, or a high degree of mental suffering." 593 S.W.2d at 339. There still had to be some physical manifestation of the mental anguish. Along came *Moore v. Lillebo*, 722 S.W.2d 683 (Tex.1986), a wrongful death case, where Justice Campbell writing for the majority, with a strong dissent by Justice Spears, held that recovery damages for mental anguish could be had despite the absence of any physical manifestations.

Over the next several years, many cases involving mental anguish, a number of which are cited and referred to in the majority opinion, came down the pike. In most of

---

4. On appeal, Appellee has not contested Appellant's assertion that the trial court erred in not discounting Appellee's future damages to present value. The record shows that the total award for future damages was $154,583.13. The award of future earnings of $33,101.32, over 4.67 years (computing Appellee's age and age 65, his age at retirement, as testified) must be discounted to its present value if paid in cash upon judgment. The discounted present value, at 15 percent per annum, equal $118,912.81.

1. A well-known American Broadway musical, music and lyrics by Stephen Sondheim, based on a play by the Roman, Titus Plautus.

2. "Where mental anguish is not connected with some other wrong, such as breach of contract, or physical injury, the allowance of such cause of action opens a wide and dangerous field in which it is difficult, if not impossible, to consistently apply the rule. It is easy to assert a claim of mental anguish and very hard to disprove it, the claim resting upon a mental condition, not capable of rebuttal by evidence within the reach or power of the defendant." *Gardner v. Cumberland Tel. Co.*, 207 Ky. 249, 268 S.W. 1108, 1110 (1925), as quoted in *Harned*, 254 S.W.2d at 86.

these cases, there was some evidence of outward manifestations of intense pain of body or mind (e.g., chronic headaches, nervous and irritable, and unable to sleep). However, there has been a tendency in some cases to conclude that there is some evidence of mental anguish if the plaintiff just says one or more of the magic words. That is to say, if the complaining party testifies that he was extremely angry or humiliated, for example, that is sufficient evidence of mental anguish (of intense pain to mind or body) to go to the jury.

We now come to the instant case where in response to a question on direct by his attorney inquiring as to what kind of suffering or anguish he had gone through since losing his job, Hinds said: "I really don't know how to put a word on it. Humiliation I suppose or victimization or something. I don't know how to word it in a clinical way." And then to the follow-up question as to what humiliation or victimization he had felt, Hinds replied simply that he was put in the position of explaining "to people who only know the other side" the real reason why he lost his job. He was unable to offer any further description of how he felt. This is no evidence of intense mental or physical pain or of a high degree of mental suffering, but merely an expression of how anyone might feel who had recently lost his job for whatever reason. Even if we are prepared to hold that the mere use of one of the magic words, in this case "humiliation," amounts to more than a scintilla of evidence of mental anguish, it is still not sufficient evidence to support a finding and an award of damages. I would sustain Point of Error No. Five and order a remittitur of the $18,000 found by the jury for mental anguish or remand for new trial.